United States District Court
For the Northern District of California

| | |
|---|---|
| JOHN CABALES, | No. C 06-6673 MHP (pr) |
|     Petitioner, | **ORDER DENYING HABEAS PETITION** |
|     v. | |
| ROBERT AYERS, JR., warden, | |
|     Respondent. | |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

## INTRODUCTION

John Cabales, a prisoner at San Quentin State Prison, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Cabales pled guilty to second degree murder in 1990 in San Joaquin County Superior Court. He was sentenced to a term of fifteen years to life in prison. His habeas petition does not concern that conviction directly, but instead focuses on a December 28, 2005 decision by the Board of Parole Hearings ("BPH") to deny him parole.

The BPH identified several reasons for its decision that Cabales "is not suitable for parole and would pose an unreasonable risk of danger to society, or a threat to public safety, if released from prison." RT 46. The BPH based its decision on the commitment offense,

Cabales' escalating pattern of criminality, and his in-prison misconduct. Although it commended Cabales for his participation in therapy and completion of work placement programs and recognized that Cabales was getting better, the BPH noted that Cabales' improvements were recent and did not outweigh the factors of unsuitability. RT 47-48.

Cabales sought relief in the state courts. The San Joaquin County Superior Court summary denied his petition for writ of habeas corpus in a reasoned decision. Resp. Exh. 6. The California Court of Appeal and the California Supreme Court summarily denied his petitions for writs of habeas corpus. Resp. Exhs. 8 and 10.

Cabales then filed his federal petition for a writ of habeas corpus. The court found two cognizable issues: whether the BPH's denial of parole violated Cabales' right to due process and whether the denial of parole violated the terms of Cabales' plea agreement. The court ordered respondent to show cause why the writ should not issue. Respondent filed an answer and Cabales filed a traverse. The matter is now ready for a decision on the merits.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed at San Quentin State Prison in Marin County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in

1  violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).
2  The petition may not be granted with respect to any claim that was adjudicated on the merits
3  in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that
4  was contrary to, or involved an unreasonable application of, clearly established Federal law,
5  as determined by the Supreme Court of the United States; or (2) resulted in a decision that
6  was based on an unreasonable determination of the facts in light of the evidence presented in
7  the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S.
8  362, 409-13 (2000).   Section 2254(d) applies to a habeas petition from a state prisoner
9  challenging the denial of parole.  See Sass v. California Board of Prison Terms, 461 F.3d
10 1123, 1126-27 (9th Cir. 2006).

11      The San Joaquin County Superior Court's decision is the last reasoned decision, and
12 therefore is the decision to which § 2254(d) applies.  See Ylst v. Nunnemaker, 501 U.S. 797,
13 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126
14 S. Ct. 2041 (2006).

### DISCUSSION

16 A.   The Sufficiency Of The Evidence Claim

17      1.    Due Process Requires That Some Evidence Support A Parole Denial

18      A California prisoner with a sentence of a term of years to life with the possibility of
19 parole has a protected liberty interest in release on parole and therefore a right to due process
20 in the parole suitability  proceedings.  See Sass, 461 F.3d at 1127-28; Board of Pardons v.
21 Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442
22 U.S. 1 (1979); Cal. Penal Code § 3041(b).

23      A parole board's decision satisfies the requirements of due process if "some evidence"
24 supports the decision.  Sass, 461 F.3d at 1128-29 (adopting some evidence standard for
25 disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).  "To
26 determine whether the some evidence standard is met 'does not require examination of the
27 entire record, independent assessment of the credibility of witnesses, or weighing of the
28 evidence.  Instead, the relevant question is whether there is any evidence in the record that

3

could support the conclusion reached'" by the parole board. Id. at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129.

A critical issue in parole denial cases concerns the BPH's use of evidence about the crime that led to the conviction. Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 479 F.3d 658 (9th Cir. 2007). Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Recently, Irons determined that due process was

1  not violated by the use of the commitment offense and pre-offense criminality to deny parole
2  for a prisoner 16 years into his 17-to-life sentence. <u>Irons</u> emphasized that all three cases
3  (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had "held that a parole board's decision to deem a
4  prisoner unsuitable for parole solely on the basis of his commitment offense comports with
5  due process, the decision was made before the inmate had served the minimum number of
6  years required by his sentence." <u>Irons</u>, 479 F.3d at 665; <u>see e.g.</u>, <u>id.</u> at 660 (inmate in 16th
7  actual year of his 17-to-life sentence).

8        The message of these three cases is that the BPH can look at immutable events, such
9  as the nature of the conviction offense and pre-conviction criminality, to predict that the
10 prisoner is not currently suitable for parole even after the initial denial (<u>Sass</u>), but the weight
11 to be attributed to those immutable events should decrease over time as a predictor of future
12 dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u> and
13 <u>Irons</u>). <u>Sass</u> did not dispute the principle that, other things being equal, a criminal act
14 committed 50 years ago is less probative of a prisoner's current dangerousness than one
15 committed 10 years ago. Not only does the passage of time in prison count for something,
16 exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and
17 <u>Irons</u>. <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the
18 decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make
19 for an arbitrary decision.

20       Having determined that there is a due process right, and that some evidence is the
21 evidentiary standard for judicial review, the next step is to look to state law because that sets
22 the criteria to which the some evidence standard applies. One must look to state law to
23 answer the question, "'some evidence' of what?"

24       2.    <u>State Law Standards For Parole For Murderers In California</u>

25       California uses indeterminate sentences for most non-capital murderers, with the term
26 being life imprisonment and parole eligibility after a certain minimum number of years. A
27 first degree murder conviction yields a base term of 25 years to life and a second degree
28 murder conviction yields a base term of 15 years to life imprisonment. <u>See</u> <u>In re</u>

5

Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal Code § 190.  The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a).  Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides:  "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c).  A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d).  A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1]  The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a).  The panel may consider all relevant and reliable information available to it.  15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes.  See 15 Cal. Code Regs. § 2403.  For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years,

1 depending on some of the facts of the crime. Some prisoners estimate their time to serve
2 based only on the matrix. However, going straight to the matrix to calculate the sentence
3 puts the cart before the horse because it ignores critical language in the relevant statute and
4 regulations that requires the prisoner first to be found suitable for parole.

5       The statutory scheme places individual suitability for parole above a prisoner's
6 expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg,
7 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the
8 prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he
9 panel shall set a base term for each life prisoner who is found suitable for parole"). The
10 California Supreme Court's determination of state law in Dannenberg is binding in this
11 federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).

12       The California Supreme Court also has determined that the facts of the crime can
13 alone support a sentence longer than the statutory minimum even if everything else about the
14 prisoner is laudable. "While the Board must point to factors beyond the minimum elements
15 of the crime for which the inmate was committed, it need engage in no further comparative
16 analysis before concluding that the particular facts of the offense make it unsafe, at that time,
17 to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re
18 Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he
19 nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"
20 but might violate due process "where no circumstances of the offense reasonably could be
21 considered more aggravated or violent than the minimum necessary to sustain a conviction
22 for that offense").

23       3.    Some Evidence Supports The BPH's Decision In Cabales' Case
24       The BPH found Cabales unsuitable for parole based on the circumstances of the
25 murder, his prior criminality, and his prison misconduct.
26       a.    Commitment Offense
27       The facts of the crime were taken from the probation officer's report and read into the
28 record by a BPH commissioner:

7

> On July 11, 1988 at approximately 5:10, according the Stockton police, [] four pedestrians in the area of Scott and Counter Street in the City of Stockton were being assaulted by an assailant wielding a shotgun. An investigation revealed that Rafael Garcia died as a result of shotgun wounds; and that [Miguel] Asseas and Louis Gonzales also sustained shotgun wounds and that [Miguel] Pastel was beaten about the head with a shotgun stock. Witness, Steven Hill, informed me that . . . the suspect exited the vehicle with what appeared to be a shotgun and loaded it, fired two rounds at one pedestrian and struck the other in the head with the stock of the shotgun . . . [a witness] observed the driver [of] the vehicle shoot a third victim at the northwest corner of the intersection above and then fire the shotgun and still another victim who was further up the street walking northbound on Commerce Court. The car then fled the scene. Inmate was identified as the individual with the shotgun.

RT 8-10; see Resp. Exh. 3, p. 1.

Cabales' version of the events was slightly different. He stated that he was in a park when several men attacked and robbed him. Resp. Exh. 3 at 1. After they ran away, he went to his friend's house where he borrowed a shotgun to chase after the men and get his belongings back. Cabales stated that when he caught up with the men, they came towards him with knives. Cabales told the men to stay where they were, but when they started running, he tried to shoot them and hit them in the legs. "One guy was running down a slope and the spread of the shotgun shell, I guess, hit too high, and some of the shot hit him in the back. When that happened, I panicked and just took off." Id. at 2.

At the hearing, it was clarified that there were two separate shootings. Cabales admitted that "the first person that I shot at, it was a mistake," RT 11, apparently meaning that the person was not involved in the earlier incident in the park.

The BPH considered the circumstances of the murder and concluded that it was carried out in an especially cruel and callous manner. A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. § 2402(c)(1).

8

There was some evidence in the record to support the BPH's finding that Cabales committed the offense in "an especially calculated manner" and "in a manner which demonstrates an exceptionally callous disregard for human suffering." RT 46. Even accepting Cabales' version of the events, he had time to go to his friend's house, borrow a gun, and hunt down the men who robbed him. The evidence shows that he had time to reflect and supports the conclusion that Cabales planned the attack. The BPH further noted that "multiple victims were attacked in separate [incidents] and one was killed." Id. "The motive for the crime was inexplicable or very trivial in relation to the offense." Id. The evidence supported this view. A witness saw Cabales fire two rounds from a shotgun at one man and strike another man in the head with the gun. Resp. Exh. 4 at 2. Cabales then returned to his vehicle and drove away. At a different intersection, another witness saw Cabales shoot a third victim and fire the gun at a fourth victim. Id. Even if the men had robbed Cabales, his motive was very trivial in relation to the calculated and extreme manner in which he attacked them by firing a shotgun at them as they tried to run away. The evidence is very clear that any robbery definitely had concluded when Cabales engaged in his murderous conduct. He left the park, retrieved a double-barreled shotgun, got in a car and went in search of the robbers. He shot first at the wrong person before finding the people he thought had robbed him. The shots he fired killed one person and hit two others. And he beat a third person with the stock of the shotgun. As the district attorney also argued, even if one accepted Cabales' version as true, this killing wasn't to stop a robbery but looked more like revenge. RT 38; see also RT 48-49. The BPH identified more than the minimum elements of a first degree murder when it determined that the facts of the murder showed Cabales' unsuitability for parole.

Cabales also urges that it was improper for the BPH to rely on the fact that multiple victims were attacked, arguing that such reliance is improper because he was not tried and convicted by a jury of attacking multiple victims. He argues that Apprendi v. New Jersey, 530 U.S. 466 (2000) forbids the use of the information.   His argument fails, because the information is properly considered by the parole authority. Cabales' sentence is 15-to-life,

9

and the BPH has not used the fact that he shot at and hit several people to extend his sentence beyond the life maximum to which he was sentenced.  <u>Apprendi</u> is not implicated by the BPH's use of the information about the particulars of the crime

    b. <u>Pre-Offense Behavior</u>

  The BPH also relied on Cabales' pre-offense history to determine that he was not suitable for parole.  "The inmate had a record of previous - an escalating pattern of criminal conduct.  Inmate failed the previous grants of probation and parole and cannot be counted upon to avoid criminality.  He has failed to profit from society's previous [sic] to correct his criminality, including juvenile probation, California Youth Authority, probation, county jail, prior prison terms and parole."  RT 47.

  The record supports the BPH's reliance on Cabales' pre-offense criminality in finding him unsuitable for parole.  Cabales committed the killing for which he is now in prison when he was 33 years old.  It was far from his first brush with the law.  He had been adjudged a ward of the juvenile court for an unknown matter in February 1969, when he was about 14 years old.  He was put in juvenile hall again in 1971 for being out of control.  In November 1972 he was booked into juvenile hall yet again for being out of control and for arson.  In November 1973, he was arrested for two counts of homicide; these were dismissed in the interest of justice and he was convicted of being an accessory to a felony; he was referred to the CDC on January 1974 for a diagnosis under Penal Code §1203.03.  In April 1974, he was committed to the CYA for being an accessory to a felony and second degree burglary, although the conviction was set aside and dismissed (apparently upon his successful completion of his incarceration) in May 1977.  <u>See</u> Resp. Exh. 3, pp. 2-3.  His adult criminal record included the following: He was arrested in November 1977 for attempted burglary and carrying a loaded firearm, which led to a conviction of misdemeanor disorderly conduct and a suspended 60-day jail sentence as well as a 2-year probation term.  In August 1978, he was arrested for burglary, which led to a conviction and 16-month prison term.  Within four months of his release from prison, he was arrested for fighting and trespassing, which led to a misdemeanor conviction and a 90-day suspended jail sentence as well as a 24-month

probation term.  He was arrested in September 1981 for attempted homicide, which was dismissed in the interest of justice.  In June 1986, he pled no contest to one count of misdemeanor child abuse.  Resp. Exh. 3, p. 3.  Two years later he committed the murder in this case.

Consideration of and reliance on Cabales' pre-offense criminal history was not improper.  Although the prisoner's "previous record of violence" on a victim is a specifically listed circumstance, the list of circumstances in  § 2402(c) is non-exclusive, and § 2402(b) specifically allows the BPH to consider a great range of relevant and reliable information, such as the prisoner's "past criminal history, including involvement in other criminal misconduct which is reliably documented."  Cabales' prior criminal activity could be considered by the BPH as tending to show unsuitability.   There was plenty of evidence to support the BPH's determination that his pre-offense criminality as well as his failure to profit from previous attempts to address his criminality tended to show he was not suitable for parole.

        c.      <u>In Prison Behavior</u>

Section 2402(b) allows the BPH to consider a great range of relevant and reliable information, such as the prisoner's social history and past and present mental state.  The BPH also may consider evidence that the "prisoner has engaged in serious misconduct in prison or jail" as tending to indicate unsuitability for parole.  15 Cal. Code Regs. § 2402(6).

The BPH found that Cabales had not demonstrated sufficient positive change in prison.  He had received three CDC-115 (serious rules violation) disciplinary reports.  The most recent CDC-115 was in 1999 for mutual combat in which he dislocated another inmate's jaw.  RT 47; Resp. Exh. 3, p. 6.  He had received another CDC-115 in 1999 for possession of tattoo paraphernalia.  <u>Id.</u>  He also had received a CDC-115 in 1993 for possession with intent to traffic methamphetamine.  Resp. Exh. 3, pp. 4, 5.   He also had received eleven CDC-128s for lesser transgressions.  Consideration of and reliance on Cabales' prison behavior and failure to demonstrate sufficient positive change was not improper.

The psychological evaluation also raised serious concerns about whether he had changed for the better. The psychologist wrote, "Given Mr. Cabales's socialization as a violent individual and protracted history of offenses involving violence, there is the possibility that he would revert to what is most familiar to him if living outside a controlled environment." Resp. Exh. 4 at 5. One cannot read that evaluation without developing grave doubts about Cabales' ability to live outside prison without hurting people with whom he gets into conflict. The psychologist who evaluated Cabales certainly saw him as a work in progress with much work still to be done, as evidenced by his comments that Cabales "has begun to understand" the benefits of avoiding violence, "has begun to see some gain from" his participation in self-help, "has begun a process of substituting old values of meeting goals through force with more socially conforming behaviors and attitudes, and "has begun to incorporate values and skills that would allow him to live free of violence in the community." Id. at 4-5.

Cabales argues that he has participated in therapy in prison and has been discipline-free for several years. Both the psychological report and the BPH recognized Cabales' achievements and progress. The BPH acknowledged Cabales' participation in Alcoholics Anonymous and Narcotics Anonymous and stated that he was "getting better." RT 49. However, the BPH also noted that Cabales' gains were recent and he needs more "therapy, self-help and programming in order to face, discuss, understand and cope with stress in a non-destructive manner and to gain further insight into the crime." RT 47. There was sufficient evidence to support the BPH's reliance on the insufficiency of Cabales' progress in prison as tending to show he was unsuitable for parole.

        d.     <u>There Was Enough Evidence To Support The Decision</u>

The BPH noted that Cabales had various in-prison achievements, but concluded that the positive factors did not outweigh the factors discussed above showing unsuitability. The factors listed by the BPH in support of its determination that Cabales was not suitable for parole had some evidentiary support. And the factors were factors that could be considered in determining parole suitability.

12

The San Joaquin County Superior Court correctly identified the "some evidence" standard as the standard for judicial review of BPH decisions and reasonably applied it to consider the evidentiary support for the BPH's conclusion that Cabales was not suitable for parole. See Resp. Exh. 6.  The San Joaquin County Superior Court's rejection of Cabales' insufficient evidence claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard.  He is not entitled to the writ.

Cabales contends that the BPH erred in relying on the commitment offense to deny parole.  The weight to be attributed to the commitment offense may fade over time as a predictor of current dangerousness as the dicta in Biggs and Irons state, but reliance on the commitment offense 15 actual years into a 15-to-life sentence would pass muster under either of those cases, and the BPH relied on much more than the commitment offense alone to determine that Cabales was unsuitable.  Furthermore, the rate at which the criminal conduct fades as a predictor slows down when the prisoner engages in further misconduct and does not demonstrate rehabilitation.  Here, Cabales had accumulated three CDC-115s for rule violations in prison and eleven CDC-128s for lesser infractions.  One of the rule violations was for fighting, indicated a continued tendency toward violence, and another was for methamphetamine.  He also had an unfavorable psychological evaluation.  These raise serious concerns about his ability to comply with the law and refrain from violence if released.  They indicate that his rehabilitation is still a work in progress.  While Cabales and other prisoners decry the use of the unchanging evidence of pre-incarceration events, in-prison behavior is something the prisoner has control over, and the fact that a prisoner continues to violate prison rules indicates that he does not have a very high level of self-control, especially when the misconduct occurs years into the sentence and at a time when he should realize how such conduct will reflect on his parole suitability.  Biggs and Irons did not stand for the proposition that in-prison behavior doesn't matter -- to the contrary, they stand for the proposition that old bad facts can at a certain point be overcome by more recent good facts regarding a prisoner's ability to conform to societal norms.

13

B.     The Breach Of Plea Agreement Claim

Cabales asserts that his plea agreement was breached when the BPH denied parole because he expected that "[a]s long as he conducted himself honorably in prison, he would secure release at the first available opportunity." Petition, p. 15. He also asserts that there was an agreement that the "crime was to be treated as second degree murder for all purposes." Id.

The breach of plea agreement claim is time-barred. "A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). A habeas petition by a state prisoner challenging a decision of an administrative body, such as the BPH, is covered by the statute and the limitations period starts to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence. 28 U.S.C. § 2244(d)(1)(D); Shelby v. Bartlett, 391 F.3d 1061, 1066 (9th Cir. 2003); see also Redd v. McGrath, 343 F.3d 1077, 1081-82 (9th Cir. 2003).

Here, the factual predicate or basis of Cabales' claim that his plea agreement was violated was known to him no later than April 2000. He was not paroled when his minimum eligible parole date ("MEPD") arrived in April 2000. He had been found not suitable for parole at his initial parole consideration hearing months earlier in February 1999, as well as at his first subsequent parole consideration date on July 2002. The February 1999 decision might have been an anticipatory breach, but certainly the actual breach occurred no later than April 2000. Further, if there was any doubt in Cabales' mind that prison officials were not living up to his parole expectations, it was removed when he was denied parole again in July 2002. Cabales' claim accrued in April 2000 and he did not file his federal habeas petition within the one-year limitations period, even allowing for the time during 2005 and 2006 that his state habeas petitions were pending. He could not revive the time-barred claim by asserting that the agreement – which by his account was irrevocably breached in 2000 – was breached again in 2005, no more than one can revive a time-barred claim on a contract by alleging a new breach years after the contract was irrevocably breached.

14

Even if the claim was not barred by the statute of limitations, the breach of plea bargain claim has no merit. "Plea agreements are contractual in nature and are measured by contract law standards." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting United States v. De la Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993)). Although a criminal defendant has a due process right to enforce the terms of a plea agreement, see Santobello v. New York, 404 U.S. 257, 261-62 (1971), there is no evidence that Cabales' subjective expectations about how parole would be decided were part of the plea agreement. He has not pointed to any language in any plea agreement that shows that any particular term in his plea agreement has been breached, but instead seems to argue that he never expected parole consideration to work the way it does. The transcript of the change of plea agreement contains no statement that Cabales would be paroled either by a specific date or under any specified conditions; the "term" Cabales imparts to the agreement was at most his unexpressed subjective belief. Cabales' sentence upon his conviction based on the plea agreement was 15-to-life and not a straight 15 year sentence. He has received the parole considerations to which he was entitled under that agreement and sentence. The San Joaquin County Superior Court's rejection of Cabales' breach of plea agreement claim was not an unreasonable application of or contrary to clearly established federal law as determined by the U.S. Supreme Court. Cabales' claim that his plea agreement was breached in violation of his right to due process fails.

## CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is denied. The clerk shall close the file.

IT IS SO ORDERED.

DATED: May 31, 2007

Marilyn Hall Patel
United States District Judge

15

# **NOTE**

1. The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).